SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
SHANNON Z. PETERSEN, Cal. Bar No. 211426
spetersen@sheppardmullin.com
LISA S. YUN, Cal Bar No. 280812
lyun@sheppardmullin.com
12775 El Camino Real, Suite 200
San Diego, California 92130
Telephone: 858.720.8900
Facsimile: 858.509.3691

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
PAUL A. WERNER (*pro hac vice* to be submitted)
pwerner@sheppardmullin.com
J. AARON GEORGE (*pro hac vice* to be submitted)
ageorge@sheppardmullin.com
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: 202.747.1900
Facsimile: 202.747.1901

Attorneys for Plaintiffs
CHARTER COMMUNICATIONS INC. and
TIME WARNER CABLE PACIFIC WEST LLC

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHARTER COMMUNICATIONS, INC., and TIME WARNER CABLE PACIFIC WEST LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF EL CENTRO, CALIFORNIA,<br><br>Defendant. | Case No. '18CV0679 AJB NLS<br><br>**COMPLAINT FOR VIOLATION OF DIVCA; PREEMPTION; AND DECLARATORY RELIEF** |

Plaintiffs Charter Communications, Inc., and Time Warner Cable Pacific West LLC (collectively, "Charter"), file this Complaint against Defendant City of El Centro, California (the "City" or "El Centro"), and allege as follows:

**INTRODUCTION**

Charter brings this litigation to stop El Centro's unlawful interference with an ongoing commercial dispute between Charter and a television broadcaster regarding the amount that Charter will be required to pay the broadcaster to retransmit its over-the-air signals in the City. The City is neither a party to nor a third party beneficiary of that retransmission agreement.

Nevertheless, to pressure Charter to carry the channels, regardless of the price demanded by the broadcaster and the impact on Charter's service and its customers, the City invoked and moved to enforce against Charter preempted, unlawful and inapplicable local code provisions. These enforcement actions, in essence, would impose fines on Charter for the broadcaster's decision to withhold its programming from Charter and its customers to gain leverage over Charter in the ongoing negotiations. The City has no right to interfere with Charter's commercial negotiations, or its customer relationships, or the programming it carries. The City's actions violate and are preempted by California law.

Charter's dispute with the City grows out of the City's effort to force Charter to concede in protracted commercial negotiations between Charter and Northwest Broadcasting, Inc. ("Northwest") – the parent company of several broadcast stations that serve El Centro and other communities – over the terms on which Northwest will consent to retransmission of its broadcast signals on Charter's cable system. Negotiations over retransmission consent are often contentious, and the parties' negotiations here stalled when Northwest insisted on an unprecedented and unwarranted increase over its previous rates for Charter to retransmit otherwise free over-the-air broadcast stations on its system. Northwest demanded payment of a per-subscriber rate that is 80 percent higher than specified in the parties' prior

agreement and more than double the retransmission rate Charter pays any other broadcaster in the entire country – an increase that would significantly and unfairly burden Charter's customers.

Charter's prior retransmission agreement with Northwest expired by its terms on January 31, 2018. To increase its leverage, on February 2, 2018, Northwest decided to pull its authorization for Charter to retransmit its broadcast signals on all of Charter's cable systems, including its El Centro system, despite ongoing negotiations. As a result, because federal law prohibits Charter from retransmitting Northwest's broadcast signals without its consent, Charter could no longer transmit them to its customers.

When Northwest removed its programming from Charter's cable system, El Centro responded by attempting to force Charter to carry Northwest's signals, by agreeing to the broadcaster's proposed carriage terms. In addition to filing an unwarranted action against Charter before the Federal Communications Commission ("FCC"),[1] El Centro invoked 20-year-old provisions of its City Code – that have since been preempted by state law – and that purport to impose requirements on recipients of locally issued cable franchises and issued a series of citations against Charter. The citations, which carry monetary penalties, allege that Charter failed to provide sufficient notice to its customers that Northwest's programming would not be available, and that Charter somehow has discriminated against some customers by failing to carry Northwest's stations. The effect of the City's actions has been to harden Northwest's negotiating position and make a deal on reasonable terms even more difficult. The City's actions also damage Charter's reputation and its relationship with its customers.

---

[1] Other cities where Northwest stations were removed from Charter's cable system also joined the FCC petition.

The City's enforcement effort is unlawful and its citations against Charter are unenforceable. Charter operates in the City under a state-issued franchise held by its subsidiary pursuant to the Digital Infrastructure & Video Competition Act of 2006 ("DIVCA"), Cal. Pub. Util. Code § 5800 *et seq.* DIVCA expressly preempts each of the City Code provisions upon which El Centro's citations are based. The City thus cannot lawfully punish Charter for alleged violations of preempted City Code provisions or enforce its citations.

Because the City has refused to withdraw its improper citations, Charter brings this action for declaratory and injunctive relief. Charter seeks a declaration that the City Code provisions on which El Centro's citations are based are preempted, that the citations themselves are unlawful and unenforceable, and that the City has violated DIVCA by attempting to force Charter to carry Northwest's programming. Charter further seeks preliminary and permanent injunctive relief prohibiting the City from engaging in its preempted and unlawful conduct.

## PARTIES

1. Time Warner Cable Pacific West LLC ("TWC") provides advanced cable communications services to residents and businesses in the City of El Centro under a DIVCA franchise. TWC is a wholly owned subsidiary of Charter Communications, Inc.

2. The City of El Centro is a municipal corporation operating under the council-manager form of local government in California.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1367 & 2201.

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties. For purposes of diversity jurisdiction, a political subdivision of a state, including a municipal corporation, is a "citizen" of the state unless it is simply the arm or alter ego of the state. *See Moor v.*

*Cnty. of Alameda*, 411 U.S. 693, 717-18 (1973). The City was and continues to be a municipality that is a "citizen" of California.

5. Pursuant to 28 U.S.C. § 1332(c), a "corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business." The citizenship of a limited liability company is determined by the citizenship of each of its members. *See Provident Energy Assocs. of Montana v. Bullington*, 77 Fed. Appx. 427, 428-29 (9th Cir. 2003). Charter Communications, Inc., is incorporated in Delaware with its primary place of business in Stamford, Connecticut. TWC is a Delaware limited liability company. None of TWC's members or its members' members reside in California.

6. The value of the declaratory and injunctive relief Charter seeks exceeds the sum or value of $75,000. Charter seeks to protect rights that are worth far more than the diversity threshold and is threatened with damage that also exceeds the threshold.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the acts and omissions giving rise to Charter's claims occurred in this District.

## BACKGROUND

### A. Regulatory Background.

8. Prior to 2006, local governments, like El Centro, served as cable franchising authorities under California and federal law. Under these laws, local governments had authority to grant cable franchises which regulated cable operators, subject to applicable law, through agreements and/or ordinances.

9. In 1998, El Centro passed Ordinance No. 98-7, adding Article X to Chapter 16 of the City Code, entitled "Cable Communications Franchise Ordinance." City Code §§ 16-328 *et seq.* El Centro last amended the Cable Communications Franchise Ordinance in 2002, under Ordinance No. 02-01.

10. At the time of its adoption, the Cable Communications Franchise Ordinance established El Centro's authority to grant franchises, *id.* § 16-330, and

specified certain requirements applicable to local franchise holders, *see id.* §§ 16-332 through 16-340.[2]

11. Section 16-322, for example, prohibited locally franchised cable operators from discriminating against subscribers or prospective subscribers. *See id.* § 16-332(a). Other sections of the City Code imposed customer service obligations on locally franchised cable operators, including advance notice of changes to the channel lineup, *id.* § 16-334, and response times and reimbursement obligations related to cable system outages, *id.* § 16-336.

12. But in 2006, California enacted DIVCA in an effort to promote competition for video services and lower prices for consumers. Cal. Pub. Util. Code §§ 5810(a)(1) & (a)(2). DIVCA moved cable franchising from the local to state level, installing the California Public Utilities Commission as "the sole franchising authority for a state franchise to provide video service under" the Act.[3] *See id.* § 5840(a).

13. In effect, DIVCA preempted all other franchising authorities in the state, including all cities and counties, from issuing cable franchises or serving as local regulators or enforcers, except as specifically provided in DIVCA. DIVCA's preemptive effect "is an essential element of the new regulatory framework

---

[2] It remains an open question whether the requirements of the City's Ordinance were lawful when they were in effect, or would be applicable here if Charter did not hold a state-issued franchise. But that is not an issue before the Court.

[3] TWC is both a cable operator and a video service provider under DIVCA. DIVCA defines a "cable operator" as "any person or group of persons that either provides cable service over a cable system and directly, or through one or more affiliates, owns a significant interest in a cable system; or that otherwise controls or is responsible for, through any arrangement, the management and operation of a cable system, as set forth in Section 522(5) of Title 47 of the United States Code." Cal. Pub. Util. Code § 5830(b). DIVCA defines "[v]ideo service" as "video programming services, cable service, or OVS service provided through facilities located at least in part in public rights-of-way without regard to delivery technology, including Internet protocol or other technology." *Id.* § 5830(s).

established by [DIVCA] as a matter of statewide concern to best ensure equal protection and parity among providers and technologies, as well as to achieve the goals stated by the Legislature in enacting [DIVCA]." *Id.* § 5810(4).

14. The Legislature's preemption of other franchising authorities under DIVCA is complete and unambiguous. *Id.* § 5840(a). Other than those requirements expressed in DIVCA, "[n]either the commission nor any local franchising entity or other local entity of the state may require the holder of a state franchise to obtain a separate franchise or otherwise ***impose any requirement on any holder of a state franchise except as expressly provided***" in DIVCA. *Id.* (emphasis added).

15. DIVCA additionally prohibits local governments from "demand[ing] any additional fees or charges or other remuneration of any kind from the holder of a state franchise . . . other than as set forth" in the Act. *Id.* § 5860(c).

16. Under DIVCA, local governments have carefully-defined and narrow authority to enforce certain state and federal non-discrimination and customer service obligations. *See id.* §§ 5890 & 5900. They do not otherwise have any authority to adopt or enforce local requirements.

17. Section 5890(a) prohibits discrimination against any group of residential subscribers because of the income of the residents or the local area in which the group resides. *Id.*§ 5890(a). While DIVCA authorizes local governments to enforce this DIVCA provision, they may not enforce them through any local procedures. Instead, they must "bring complaints to the state franchising authority." *Id.* § 5890(g). Thus, the state commission, not a local municipality, is tasked with holding hearings, determining whether a holder is in violation of applicable requirements, and imposing any applicable fines. *Id.* § 5890(g)-(h).

18. Charter's carriage dispute with Northwest does not implicate any non-discrimination requirements, whether imposed locally or by the state. In any event, local governments have no authority under DIVCA to establish or enforce their own

non-discrimination requirements, let alone apply any local enforcement procedures, or impose fines for purported violations of local cable service code provisions.

19. Section 5900 of DIVCA further requires holders of state-issued franchises to "comply with the provisions of Sections 53055, 53055.1, 53055.2, and 53.088.2 of the Government Code, and any other customer service standards pertaining to the provision of video service ***established by federal law or regulation or adopted by subsequent enactment of the Legislature***." *Id.* § 5900(a) (emphasis added).

20. Government Code Sections 53055, 53055.1, and 53055.2 are incorporated into DIVCA and require cable operators to adopt and comply with their own customer service standards – not those adopted by any local government. Government Code Section 53088.2 further imposes certain customer service requirements, including related to outages (§ 53088.2(g)) and customer notice for channel lineup changes (§ 53088(h)).

21. Federal law further imposes additional customer service requirements related to channel lineup changes and outages. *See, e.g.*, 47 C.F.R. §§ 76.309 (customer service obligations) & 76.1603 (notices).

22. While DIVCA permits local governments to enforce these federal and state customer service standards under certain circumstances, they "***may not adopt or seek to enforce any additional or different customer service or other performance standards under . . . any other authority or provision of law***." Cal. Pub. Util. Code § 5900(c) (emphasis added).

23. Under DIVCA, local governments may only impose monetary penalties for customer service violations up to the amounts set by statute, and only after they provide written notice and at least 30 days to cure. *Id.* § 5900(d)-(e). DIVCA further allows any interested person to "utilize any judicial remedy available to it," including by seeking "judicial review of a decision of the local entity in a court of appropriate jurisdiction." *Id.* § 5900(h)-(i). Indeed, DIVCA provides for *de novo*

judicial review and, as such, any actions taken by a local government are not binding on the court. *Id.*

**B. Factual Allegations.**

24. Charter provides video programming services over its cable systems throughout the country, including to residents and business customers in El Centro and surrounding areas.

25. Charter's video programming includes hundreds of channels, including local broadcast stations, national cable channels (*e.g.*, A&E, AMC, Animal Planet, BET, Bravo, CNN, Disney Channel, Discovery, ESPN, and more), and premium entertainment channels (*e.g.*, HBO, Showtime). Charter also provides on-demand and pay-per-view programming. To carry all of this programming on its cable system, Charter must reach agreement with the owners of the programming, including with the local broadcast stations that have elected under federal law to require Charter to obtain their express consent for carriage. 47 U.S.C. § 325(b). Charter uses its editorial discretion and, with a few exceptions not relevant here, ultimately chooses the channels that it does and does not carry on its cable systems based on its ability to negotiate acceptable terms and conditions of carriage.

26. Prior to February 2, 2018, Charter carried the over-the-air broadcast signals of KYMA, an NBC affiliate, and KWST, a CBS affiliate, both of which are owned by Northwest, on its cable system in El Centro. Charter carried these broadcast stations in El Centro, and other markets, based on negotiated retransmission agreements with Northwest.

27. Because Charter's retransmission agreements with Northwest were set to expire on January 31, 2018, the parties began negotiating new retransmission agreements in 2017. While Charter negotiated in good faith, Northwest demanded an outrageous increase in carriage fees. As the expiration date approached, Northwest continued to demand an 80-percent increase in carriage fees, more than double the rate Charter pays any other broadcaster anywhere else in the entire

country. Because Northwest's demanded carriage fees would substantially and unfairly impact Charter's customers, Charter refused to accept them.

28. In light of Northwest's unreasonable demands, the parties were unable to reach a new retransmission consent agreement before their existing agreement expired. While the parties agreed to two 24-hour extensions, through 5:00 pm Eastern Standard Time on February 2, 2018, they still could not reach a new agreement.

29. On February 2, 2018, in an effort to exert additional leverage over Charter in the parties' negotiations, Northwest "blacked out" its broadcast signals from Charter's lineups, including KYMA and KWST, by refusing to allow Charter to retransmit them without a new retransmission consent agreement. Under federal law, Charter may not "retransmit the signal of any commercial broadcasting station [electing retransmission consent] without the express authority of the originating station." 47 U.S.C. § 325(b); 47 C.F.R. § 76.64(a).

30. At the time that Northwest pulled its broadcast authorization from Charter's channel lineup, the stations' ratings were in steep decline – more than 13 percent in over the last five years.

31. Northwest is notorious for blacking out its television broadcast signals in retransmission consent negotiations with video distributors. Through this approach, it seeks to gain leverage by creating disruption, depriving the distributor's customers of programming, and attempting to turn the distributor's customers against it. Northwest precipitated blackouts on Verizon FiOS and Cable One in 2017, and both DirectTV and DISH Network a few years before, in order to bolster its negotiating position in retransmission consent negotiations.

32. Northwest's blackout of its programming on Charter's cable system is rare for Charter. Charter has successfully negotiated carriage arrangements with hundreds of broadcast stations, including ABC, NBC, CBS, and FOX affiliated local stations.

33. While Charter similarly hoped for a mutually beneficial resolution without any blackout in this situation, it was unable to provide 30 days' advance notice to its customers because Northwest's decision to pull its authorization for Charter to transmit KYMA and KYST was not within Charter's control. Negotiations between cable operators and broadcasters usually come down to the final 30 days of an agreement – indeed, often down to the final day or hours – and are often marked by vigorous and even at times contentious exchanges. The negotiations between Charter and Northwest have been no different. Until Northwest withdrew its authorization, Charter remained hopeful that an agreement could be reached without a blackout.

34. Once Northwest pulled its authorization, Charter immediately notified its customers through multiple communication channels, including on-air announcements, emails, and its website. Charter also sent a courtesy notice to impacted municipalities, including El Centro.

35. Following these notifications, on or about February 15, 2018, the City and Charter began communicating about the blackouts of KYMA and KWST on its cable system and Charter's efforts to resolve its carriage dispute with Northwest.

36. On March 7, 2018, El Centro served two sets of citations on Charter, related to each of the two channels for which Northwest revoked Charter's authorization: Case No. 18-0056 (Citation No. 18-0002) and Case No. 18-0057 (Citation No. 18-0003). The citations allege violations of five provisions of Article X of the City Code, with separate violations asserted for each Code provision over each day from March 1, 2018, through March 6, 2018. Each citation imposes a $100 fine for each violation, each day.

37. The City alleges violations of local nondiscrimination and customer service requirements:

- Section 16-332(a) – Prohibiting discrimination among subscribers based on specified protected classes.

- Section 16-334(b) – Requiring notices to the City and subscribers 30 days in advance of making any change in cable service or rates.
- Section 16-336(a)(2) – Establishing time frames for responding to service interruptions and service problems.
- Section 16-336(b) – Requiring rebates for service interruptions exceeding a stated duration and failure to make a service call within specified time period.
- Section 16-336(g)(3) – Requiring 30 days' advance notice to the City and subscribers of rate increases or changes in the channel lineup, except where the local franchisee is not aware of the changes in advance and the changes are not under the franchisee's control.

38. The citations purported to require Charter to pay the fines by March 13, 2018, and/or to appeal the citations by March 28, 2018.

39. When Charter requested the City withdraw the unlawful and preempted citations, the City extended Charter's appeal deadline to April 4, 2018, so that it could consider Charter's request. But, to date, the City has City not withdrawn its citations.[4]

40. Northwest's pulling its authorization for Charter to carry its broadcast signals is not a "service interruption" within the meaning of the City Code provisions in question. Even if it were, while El Centro demands that Charter "cure" its alleged violations, the only means for Charter to do so is to finalize a retransmission agreement with Northwest. The City's citations are thus intended to pressure Charter to accept Northwest's unreasonable terms by imposing fines and intentionally damaging Charter's reputation and harming its goodwill and relationships with its existing and prospective customers.

---

[4] The City indicated on the eve of the appeal deadline that it would be willing to withdraw some, but not all, of the citations.

41. As part of this effort, on March 15, 2018, El Centro joined with the Town of Jackson, Wyoming, and the City of Yuma, Arizona, to petition the FCC to enforce federal customer service obligations related to Charter's inability to carry Northwest's broadcast stations in those markets (the "FCC Petition") against Charter. Based wholly on representations by Northwest's Chief Executive Officer that contain numerous omissions, inaccuracies, and erroneous characterizations of the facts and the sequence of events that led up to the blackout, the cities allege Charter intentionally violated the FCC's notice rules and ask the FCC to impose severe penalties on Charter. The FCC Petition is in effect an effort by El Centro (along with the other cities and Northwest) to put itself in the middle of this dispute and therefore pressure Charter to carry Northwest's programming, no matter the cost, by harming Charter's reputation and poisoning Charter's relationships with its customers.

42. El Centro also submitted a declaration, under penalty of perjury under 28 U.S.C. § 1746, in support of the FCC Petition. *See id.*, Declaration of Elizabeth L. Martyn ("Martyn Decl."). The declaration admitted that "Charter operates in El Centro under a state video services franchise issued to its subsidiary, [TWC], by the California Public Utility [sic] Commission." *Id.*, Martyn Decl. ¶ 2. The declaration further concedes that "El Centro is authorized under [DIVCA] to enforce customer service standards" arising under federal law. *Id.*, Martyn Decl. ¶ 3.

43. The City's enforcement actions and follow-on proceedings have harmed and will continue to harm Charter's reputation and goodwill. If the City is allowed to enforce its citations, Charter will not only be subject to potential liability for the fines so far assessed, but also for additional fines based on alleged violations of the same City Code provisions accruing since March 7, 2018. Under Section 16-336 of the El Centro Code, the City might also require Charter to issue refunds to customers that are contrary to Charter's terms of service, and in so doing improperly interfere with Charter's contractual relationship with its customers. Finally, the only

means for Charter to "cure" the alleged City Code violations and to prevent further efforts by the City to enforce these requirements as continuing violations is to knuckle under to Northwest's unreasonable demands.

44. The City's actions, in coordination with Northwest, interfere with Charter's relationships with its existing and prospective customers, who are being encouraged to cancel Charter's services and subscribe to video services from Charter's video distribution competitors.

**COUNT I**

**(Violation of DIVCA, Cal. Pub. Util. Code §§ 5800 *et seq.*)**

45. Charter incorporates by reference the allegations contained in Paragraphs 1-44 as if fully restated herein.

46. DIVCA carefully and narrowly defines and restricts the scope of local governmental authority, specifically proscribing local regulations that purport to expand the obligations of cable operators holding state-issued franchises. DIVCA nowhere gives local governments like the City authority to impose and enforce their own local nondiscrimination and customer service requirements.

47. DIVCA also prohibits local governments like the City from imposing or assessing any fees or monetary penalties not specifically authorized by the statute. DIVCA nowhere authorizes the penalties the City seeks to impose under the Citations.

48. DIVCA explicitly preempts each of the City Code provisions upon which El Centro's Citations are based.

49. El Centro's efforts to enforce its preempted City Code provisions, including through the Citations, violate and exceed its authority under DIVCA.

**COUNT II**

**(Declaratory Judgment Under 28 U.S.C. §§ 2201 & 2202)**

50. Charter incorporates by reference the allegations contained in Paragraphs 1-44 as if fully restated herein.

51. "In the case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. That declaration "shall have the force and effect of a final judgment." *Id.*

52. An actual controversy has arisen and now exists between Charter and El Centro with respect to the enforceability of City Code provisions purporting to regulate cable franchisees.

53. In light of DIVCA and its broad preemptive effect, Charter disputes the lawfulness of El Centro's efforts to enforce, through the Citations, provisions of Article X of the City Code related to nondiscrimination and customer service requirements. Charter also disputes the lawfulness of El Centro's efforts to compel Charter to carry Northwest's signals on Charter's cable system.

54. Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances.

**PRAYER FOR RELIEF**

With respect to its Complaint, and based on the foregoing, Charter prays for the following relief:

1. For a declaration that DIVCA preempts each of the City Code provisions upon which El Centro's Citations are based, and the City cannot lawfully seek to enforce its Citations.

2. For a declaration that El Centro's efforts to enforce its preempted City Code provisions, including through the Citations, violate and exceed its authority under DIVCA.

3. For a preliminary and permanent injunction preventing El Centro from seeking to enforce its preempted City Code provisions, whether through the Citations, additional code enforcement citations, or any other unlawful action.

4. For costs of this action to the fullest extent permitted by law.

5. For such other further relief as the Court may deem just and proper.

Dated: April 4, 2018

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By *s/Lisa S. Yun*

LISA S. YUN
PAUL A. WERNER (*p.h.v.* to be submitted)
J. AARON GEORGE (*p.h.v.* to be submitted)

Attorneys for Plaintiffs
Charter Communications, Inc., and Time Warner Cable Pacific West LLC
Email: lyun@sheppardmullin.com